*State of New York*
*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:   July 24, 2014                    516237
_____

In the Matter of ASIANNA NN.
    and Another, Alleged to be
    Permanently Neglected
    Children.

ALBANY COUNTY DEPARTMENT OF                  MEMORANDUM AND ORDER
    CHILDREN, YOUTH AND
    FAMILIES,
                    Respondent;

KANSINYA OO.,
                    Appellant.
_____

Calendar Date:   May 27, 2014

Before:   Lahtinen, J.P., McCarthy, Garry, Lynch and Clark, JJ.

_____

        Sandra M. Colatosti, Albany, for appellant.

        James J. Green, Albany County Department of Children, Youth
and Families, Albany, for respondent.

        Carol R. Stiglmeier, Albany, attorney for the children.

        Gleason, Dunn, Walsh & O'Shea, Albany (Brendan C. O'Shea of
counsel), for Gail W., intervenor.

        Nancy E. Stroud, Latham, for Christine OO. and Andrew OO.

_____

Garry, J.

Appeals (1) from an order of the Family Court of Albany County (M. Walsh, J.), entered March 26, 2012, which granted petitioner's application, in a proceeding pursuant to Social Services Law § 384-b, to adjudicate respondent's children to be permanently neglected, (2) from an order of said court, entered January 3, 2013, which terminated respondent's parental rights, and (3) from an amended order of said court, entered May 16, 2013, which, among other things, granted petitioner's motion to modify the prior order of disposition by committing the care, custody and guardianship of Asianna NN. to her maternal grandparents.

Respondent is the mother of two children (born in 2005 and 2006). In September 2007, the maternal grandparents arrived at respondent's home in mid-afternoon, immediately noticed that something was wrong with the younger child – then 11 months old – and took her to the hospital. The child was admitted in critical condition with bilateral subdural hematomas, retinal hemorrhaging and other injuries that, according to the treating medical providers, indicated shaken baby syndrome and blunt force trauma. Petitioner's caseworker later testified that the child had "obvious" injuries, with extensive bruises on her face and abdomen and dried blood on her ears. Respondent maintained, however, that she had noticed nothing wrong with the child while caring for her earlier that day other than a fever; she said that she did not know how the child was injured and could not think of anyone who might have harmed her.[1] Respondent's paramour ultimately admitted that he had spent the night in the apartment and had violently shaken the child early that morning.

Petitioner commenced proceedings pursuant to Family Ct Act article 10 to adjudicate both of respondent's children to be

_____

[1] Respondent initially said that she had taken the child to a hospital that morning for treatment of the fever, but when it was later determined that there were no records of such treatment, admitted that this claim was not true. She further claimed that the child's bruises resulted from a fall from a bed.

abused based on her failure to protect them from the paramour and to seek medical attention for the younger child. Upon respondent's consent, the children were temporarily removed and placed in petitioner's care and custody. The temporary order of removal was later modified to place the older child in the custody of the maternal grandparents, where she still remains. The younger child was hospitalized for several weeks in a pediatric intensive care unit, transferred to a rehabilitation facility and, after several months, placed in the pre-adoptive foster home where she now resides. She is diagnosed with a traumatic brain injury and continues to suffer from one-sided paralysis, cognitive deficits and other long-term consequences of the assault.

Following a joint trial, the paramour was convicted in early 2009 of reckless assault of a child; respondent was convicted of endangering the welfare of a child and sentenced in March 2009 to a one year jail term. Shortly thereafter, Family Court adjudicated both children to be abused pursuant to respondent's consent without admission. In August 2009, while respondent was serving her sentence, petitioner commenced this permanent neglect proceeding. Following respondent's release in November 2009, a fact-finding hearing was held on multiple days between May 2010 and February 2011. In March 2012, Family Court adjudicated both children to be permanently neglected; following a dispositional hearing, the court terminated respondent's parental rights and placed both children in petitioner's custody. Petitioner subsequently moved to modify the order of disposition to commit the custody and guardianship of the older child to the maternal grandparents, and this motion was granted. Respondent appeals from the order of fact-finding and the order and amended order of disposition.

Contrary to respondent's assertion, the record demonstrates that petitioner exercised the requisite diligent efforts to encourage and strengthen her relationship with the children (see Social Services Law § 384-b [7]; Matter of Star Leslie W., 63 NY2d 136, 142 [1984]). Respondent concedes that petitioner offered her a range of rehabilitative services, including, among other things, preventive services, domestic violence counseling and visitation assistance; however, she asserts that these

services were inadequately goal-specific and did not satisfy petitioner's duty to provide services particularly tailored to "ameliorate the problems preventing discharge of the child[ren] to [her] care" (Matter of Hailey ZZ. [Ricky ZZ.], 19 NY3d 422, 429 [2012] [internal quotation marks and citation omitted]). Petitioner counters that its inability to obtain more individualized recommendations was the direct consequence of respondent's delay in undergoing a recommended psychological evaluation and family assessment. Petitioner's caseworker testified that such an assessment was required to identify mental health issues that might have contributed to respondent's initial failure to seek medical treatment and her alleged ongoing failure thereafter to recognize the severity of the child's condition and accept responsibility for her role in causing her injuries. The record confirms that for more than a year, petitioner repeatedly offered to arrange the assessment, explained the need for it and advised respondent that her refusal to participate was hindering reunification with her children; respondent nevertheless refused to cooperate on the ground that her defense counsel had advised her not to do so until the criminal prosecution was resolved. Following her conviction in 2009, respondent did undergo the evaluation, but was then incarcerated almost immediately thereafter. Petitioner was not required to provide rehabilitative services while respondent was incarcerated (see Social Services Law § 384-b [7] [f] [3]; Matter of Havyn PP. [Morianna RR.], 94 AD3d 1359, 1361 [2012]; Matter of Kaiden AA. [John BB.], 81 AD3d 1209, 1210 [2011]). In view of the broad range of services that petitioner provided, together with respondent's resistance to the mental health evaluation, we find no error in Family Court's determination that petitioner satisfied its statutory duty (see generally Matter of Sheila G., 61 NY2d 368, 385 [1984]).

Respondent next contends that petitioner did not prove by clear and convincing evidence that she "failed 'substantially and continuously or repeatedly to maintain contact with or plan for the future of the child[ren]'" (Matter of James J. [James K.], 97 AD3d 936, 938 [2012], quoting Social Services Law § 384-b [7] [a]). It is uncontroverted that respondent has maintained an affectionate bond with both children, visiting them consistently and as frequently as she was permitted to do so. However, a

finding of permanent neglect may be based on either a showing of a failure to plan or to maintain contact; merely maintaining contact may not suffice (see Matter of Chorus SS. [Elatisha SS.], 93 AD3d 1097, 1098 [2012], lv denied 19 NY3d 807 [2012]; Matter of Jyashia RR. [John VV.], 92 AD3d 982, 984 [2012]).  Here, petitioner contends that respondent failed to plan for her children's future by, among other things, delaying the psychological evaluation, failing to meaningfully engage in all of the services offered to her and, most significantly, failing to take responsibility for and gain insight into the problems that led to the children's removal and thereafter prevented their return.

In this regard, respondent contends that her delay in undergoing the psychological assessment should not have counted against her, as she was exercising her constitutional privilege against self-incrimination.  This privilege applies in Family Court proceedings, but does not permit a general refusal to answer all inquiries, and may be asserted only if "a direct answer by the witness confronts him or her with a substantial and real danger of criminal prosecution" (Matter of Ashley M., 256 AD2d 825, 826 [1998]; see Matter of Gladys H., 235 AD2d 841, 842 [1997]).  Here, respondent was indisputably confronted with an ongoing criminal prosecution, and, as the assessment was intended to result in a report to petitioner, respondent's communications would not have been protected by the evidentiary privilege applicable in confidential therapeutic settings (see generally State of New York v General Elec. Co., 201 AD2d 802, 803 [1994]; compare Matter of Ashley M., 256 AD2d at 826).  It was not clearly established, however, that respondent's participation in the assessment would necessarily have required prejudicial admissions.  The psychologist who ultimately conducted the assessment testified that his purpose in such inquiries was to assess the need for services, and not to determine culpability; as such, he stated that he avoided "legal issues" and did not challenge the parent's presentation of events or press for factual details.  Further, even when properly asserted, a parent's exercise of the privilege in Family Court permits the trier of fact to draw the strongest negative inference supported by the evidence (see Matter of Michael U. [Marcus U.], 110 AD3d 821, 823 [2013]; Matter of Rauss v Johnson, 243 AD2d 849, 850

[1997]).  Finally, as the expeditious resolution of proceedings involving the welfare of children is strongly favored, parents' rights in this setting are deemed subordinate to the purpose of protecting children, for which Family Ct Act article 10 was enacted (see Family Ct Act § 1049; Matter of Joseph DD., 300 AD2d 760, 766 [2002], lv denied 100 NY2d 504 [2003]).  Accordingly, in considering these factors upon review, we find no abuse of discretion in Family Court's determination that, by refusing to participate in the assessment for more than a year, respondent placed her own needs ahead of those of her children in a manner that constituted a failure to plan for their future (see generally Matter of Emily I., 50 AD3d 1181, 1181-1182 [2008], lv denied 10 NY3d 712 [2008]; Matter of Germaine B., 86 AD2d 847, 848 [1982]).

As respondent argues, the record reveals that she has engaged in some of the services offered and, as noted above, she has been quite consistent with visitation.  However, even with committed contact, a parent's ongoing refusal or inability to acknowledge and correct conditions that required the children's removal in the first instance may be deemed to constitute a failure to plan for their future (see Matter of Alysheionna HH. [Tara II.], 101 AD3d 1413, 1415 [2012], lv denied 20 NY3d 861 [2013]; Matter of Tailer Q. [Melody Q.], 86 AD3d 673, 674 [2011]).  In the course of planning for respondent's safe reunification with her children, petitioner repeatedly encouraged her to acknowledge her responsibility for the younger child's injuries, in that she allowed the paramour — whom she knew to have serious anger management issues — to have contact with the child, and then failed to seek immediate medical attention for her.  Respondent steadfastly refused to admit responsibility for such wrongdoing.  Even at the time of the fact-finding hearing — three years after the children were removed — respondent continued to deny that she had failed to seek timely medical attention for the child, insisting that she had taken her to the hospital within minutes after noticing that "[s]he was limp and her eyes were kind of rolling back in her head," and offering no adequate explanation as to how she had failed to notice this condition earlier in the day, in the course of feeding and caring for the child.

The record further demonstrates an ongoing tendency on respondent's part to deny or minimize the seriousness of the younger child's condition. Upon admission, the child's injuries were so severe that she was near death, could no longer walk or crawl, had lost the ability to swallow and suck, and was fed through a tube; she recovered only gradually and continues to suffer serious long-term deficits. In the months following the assault, respondent told providers that the child could do things that she was not able to do, such as sitting independently and eating solid foods. While the child was still being tube-fed, respondent fed her a hard cookie, and told a caseworker that she had also given her chips. Despite meetings with the child's medical providers to explain her medical condition, respondent failed to understand why this conduct was a problem. Taken as a whole, we thus find that clear and convincing record evidence supports Family Court's conclusion that respondent failed to substantially plan for the children's future in that she did not "take meaningful steps toward alleviating the conditions that led to the children's removal from their home in the first instance" (Matter of Neal TT. [Deborah UU.], 97 AD3d 869, 871 [2012] [internal quotation marks and citations omitted]; see Matter of Kayden E. [Luis E.], 111 AD3d 1094, 1097 [2013], lv denied 22 NY3d 862 [2014]; Matter of Alysheionna HH. [Tara II.], 101 AD3d at 1414-1415; Matter of Vivian OO., 34 AD3d 1111, 1114 [2006], lv denied 8 NY3d 808 [2007]).

Finally, respondent contends that her request for a suspended judgment should have been granted. "'Following an adjudication of permanent neglect, the sole concern at a dispositional hearing is the best interests of the child and there is no presumption that any particular disposition, including the return of a child to a parent, promotes such interests'" (Matter of Johanna M. [John L.], 103 AD3d 949, 951 [2013], lv denied 21 NY3d 855 [2013], quoting Matter of Angelica VV., 53 AD3d 732, 733 [2008]; see Family Ct Act § 631). With regard to the younger child, the record reveals ongoing concerns relative to respondent's judgment and ability to meet the child's substantial and complex special needs. In contrast, the testimony established that the foster mother, who had cared for the younger child during the course of the several years following her release from the rehabilitation facility, excelled

in understanding and meeting the child's needs.  She had undergone many hours of training, coordinated the younger child's complicated schedule of multiple appointments with medical providers and therapists, and acted as an independent advocate by seeking out additional beneficial services, such as orthopedic treatment at Shriner's Hospital in Massachusetts.  By all accounts, strong and loving bonds exist between the younger child and the foster mother, as well as other children in the foster home, where the child has spent almost all of her life.  Given this bond, the foster mother's demonstrated competence, and her desire to adopt the younger child, we find a sound and substantial basis in the record for Family Court's determination that it was in the younger child's best interests to free her for adoption (see Matter of Angelina Jessie Pierre L. [Anne Elizabeth Pierre L.], 114 AD3d 471, 472 [2014], lv denied 23 NY3d 901 [2014]).[2]

_____

[2]  We note with considerable concern, however, that it appears that petitioner may be imposing a blanket prohibition against unsupervised visitation during the course of termination proceedings.  The instant proceeding was quite protracted; the fact-finding hearing consumed almost a year, and an additional 13 months ensued thereafter before Family Court rendered its written decision (apparently resulting, at least in part, from a transcript problem).  Additional time was then required for the dispositional phase, resulting in the passage of more than 3½ years before the permanent neglect proceeding was complete.  Consequently, several years passed during which respondent had no unsupervised contact with either child, and was prevented from demonstrating whether she was capable of parenting them, while the children's bonds with her weakened and their relationships with their substitute caretakers deepened.  The permanency reports repeatedly acknowledge that the children could not be returned to respondent unless she could care for them independently, but that her ability in this regard could not be determined because she had no unsupervised contact.  It cannot be overlooked that these circumstances may have contributed to the result — particularly as to the younger child, with whom respondent was allowed only limited contact (see generally Matter of Joseph DD., 300 AD2d at 766).

We cannot make the same finding with regard to the older child. The dispositional proceedings focused almost exclusively on the younger child's needs and the relative abilities of respondent and the foster mother to satisfy them; the older child was only rarely mentioned in the course of the proceedings, and her best interests were not adequately addressed. There was no testimony as to whether this child, attending kindergarten at the time of the dispositional hearing, had needs that respondent could not fulfill or that the grandparents were better able to satisfy. Moreover, unlike the younger child, the older child has lived with respondent's close-knit family throughout the proceedings and thus had frequent — albeit supervised — contact with respondent. Given this close contact, it was not shown that this child's stay outside respondent's custody had so damaged or weakened the parent/child relationship that it was in her best interests to sever it. On the contrary, the maternal grandmother testified without contradiction that respondent saw the older child almost daily, took on a parenting role when they were together and that the two enjoyed each other's company and had a close, loving mother/child relationship.

Respondent's request for a suspended judgment may serve the older child's best interests by offering respondent an opportunity to increase their unsupervised contact and demonstrate whether she is capable of caring for the child (see Family Ct Act §§ 631 [b]; 633). However, the scant record evidence pertaining to the older child prevents this Court from making that determination (compare Matter of Arianna I. [Roger I.], 100 AD3d 1281, 1283-1284 [2012]; Matter of Eric G., 59 AD3d 785, 788 [2009]). Therefore, despite our reluctance to add further delay to the already lengthy period during which this child has lived without permanency, we reverse the orders of disposition insofar as they pertain to the older child, and remit for a new dispositional hearing to address her best interests (see Matter of Krystal B. [Thomas B.], 77 AD3d 1110, 1111 [2010]).[3]

_____

    [3] At the time of entry of the modified order of disposition, the maternal grandparents intended to commence adoption proceedings within six months. This Court thereafter

Lahtinen, J.P., McCarthy, Lynch and Clark, JJ., concur.


ORDERED that the order entered March 26, 2012 is affirmed, without costs.

ORDERED that the order entered January 3, 2013 and the amended order entered May 16, 2013 are modified, on the law, without costs, by reversing so much thereof as terminated respondent's parental rights as to Asianna NN. and as awarded the care, custody and guardianship of Asianna NN. to her maternal grandparents; matter remitted to the Family Court of Albany County for further proceedings not inconsistent with this Court's decision and, pending said proceedings, the terms of the amended order entered May 16, 2013 that awarded care, custody and guardianship of Asianna NN. to the maternal grandparents shall remain in effect on a temporary basis; and, as so modified, affirmed.


ENTER:

Robert D. Mayberger
Clerk of the Court


stayed the entry of any final order of adoption pending the completion of this appeal.